IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BERTEC CORPORATION, | : |
| Plaintiff, | : Case No. 2:19-CV-04623 |
| v. | : CHIEF JUDGE ALGENON L. MARBLEY |
| SPARTA SOFTWARE CORPORATION AND PLAYGROUND GLOBAL LLC | : Magistrate Judge Vascura |
| Defendants. | : |

**OPINION AND ORDER**

This matter comes before the Court on the Motion for Preliminary Injunction by Plaintiff, Bertec Corporation. (ECF No. 2). Defendants Sparta Software Corporation and Playground Global LLC have each filed their opposition to Plaintiff's motion. (ECF No. 47; No. 44). Bertec has replied. (ECF No. 56). A hearing was held on December 17, 2019. For the reasons stated below, this court **DENIES** Plaintiff's motion.

## I. BACKGROUND

Bertec Corporation ("Bertec") is an Ohio company that manufactures and sells force plates, a product that analyzes a person's gait, balance, and performance in certain exercises when a person jumps on the force plate. (ECF No. 2 at 4-5). Sparta Software Corporation ("Sparta") is a corporation that provides health and performance software and services to athletes and military personnel. (ECF No. 27 at 2). Playground Global LLC ("Playground") is a Palo Alto venture capital fund that invests in and provides engineering and other services to early stage startup companies, like Sparta. (ECF No. 44 at 2). Playground invested approximately $5 million in Sparta in December 2017 and acquired 20% of Sparta's shares. *Id.* at 4.

1

Beginning in December 2017, Playground conducted due diligence into Sparta's business operations and learned that Sparta had no capabilities to manufacture its own force plates. Sparta and Playground agreed that Playground would design a prototype of a force plate for Sparta and Sparta would decide whether to use that prototype. (ECF No. 44 at 5). Between June and September 2018, Playground built and tested a force plate prototype. *Id.* at 6. In July of 2018, Playground tested its prototype and did some benchmark comparisons of its prototype compared with Bertec's force plates. *Id.* at 6. According to Playground, it used a publicly available program called Tera Term as well as Bertec's free and publicly available software to read the raw data generated by both the prototype and Bertec's force plates. *Id.* Playground conducted further testing in September 2018 and then handed off the design files to Sparta. *Id.* Sparta also identified several manufacturers that Sparta could pay to build the force plate prototype and continued to provide input into Sparta's manufacturing of its own force plate. *Id.* at 6-7.

Bertec has sold Sparta force plates since 2010. (ECF No. 2 at 5). Since 2016, Sparta's customers experienced issues with Bertec's force plates which Sparta tried to resolve by asking Bertec to debug its code. (ECF No. 47 at 4). In 2017, upon Sparta's request, Bertec made changes to its software's source code to make the force plate compatible with Sparta's needs. (ECF No. 47 at 3). Those changes were written in MATLAB code and were provided to Sparta in January 2017. *Id.* According to Sparta, those changes did not help resolve the issues Sparta's customers were facing, so Sparta requested access to Bertec's source code. (ECF No. 47 at 4). In August 2018, around the same time that Playground was developing and testing its force plate prototype, Bertec and Sparta negotiated and entered into an Exclusive Supply and Software License Agreement ("Agreement") wherein Sparta agreed to purchase all the force plates it would need exclusively from Bertec for five years and Bertec agreed to give Sparta access to its source code so that Sparta

could standardize its data to ensure it was medically and scientifically valid. (ECF No. 2 at 7-8). Sparta contends that upon gaining access to the source code, it discovered the code was just a "translation" of the MATLAB code that Sparta had already received from Bertec. (ECF No. 47 at 6). In June 2019, Sparta informed Bertec that it was planning to create and sell its own force plates, and that it had been developing these force plates since December 2017. (ECF No. 2 at 9).

Bertec brought suit against Sparta and Playground on October 18, 2019 for breach of contract, promissory estoppel, unjust enrichment, tortious interference, and misappropriation of trade secrets, alleging that Sparta breached the Agreement at Playground's direction by sharing its source code with Sparta to create its own force plates. (ECF No. 1; No. 2 at 9-10). In its motion for a preliminary injunction, it requests that this Court: (1) enjoin Sparta's breach of the Agreement with Bertec; (2) enjoin Playground's tortious interference with the Agreement; (3) enjoin Sparta and Playground's misappropriation of Bertec's trade secrets.

Playground alleges that it did not know about the agreement between Bertec and Sparta until this lawsuit was filed in October 2019 and that it has never seen the source code that Bertec produced to Sparta. (ECF No. 44 at 7). Sparta argues that Bertec cannot establish a likelihood of success on its contract claim, disputing that it has breached the Agreement and arguing that Bertec has no evidence that Sparta misappropriated its source code. (ECF No. 47).

In its reply, Bertec clarified that it is only moving for an injunction on its breach of contract claim, abandoning its requests made in its motion for a preliminary injunction as to the tortious interference and misappropriation of trade secrets claims. (ECF No. 56 at 2 n.1).

## II.     LEGAL STANDARD

Preliminary injunctions are extraordinary remedies which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it. *See*

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In light of its "limited purpose," a preliminary injunction is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Accordingly, a party need not prove her case in full at a preliminary injunction hearing. *Id.* Whether to grant such relief is a matter within the discretion of the district court. *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166-67 (6th Cir. 1989).

Courts consider four factors when determining whether to grant a request for a preliminary injunction. Those factors are: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). A party seeking an injunction must establish each element of its case by clear and convincing evidence. *See Handel's Enterprises, Inc. v. Schulenburg*, 765 Fed.Appx. 117, 124 (6th Cir.2019); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir.1998) (citing *Garlock, Inc. v. United Seal, Inc.,* 404 F.2d 256, 257 (6th Cir.1968)).

### III. LAW & ANALYSIS

In Bertec's reply, it clarified that "Bertec is only moving for an injunction on its breach of contract claim." (ECF No. 56 at 2 n.1). Therefore, this Court **DENIES as MOOT** Bertec's request for a preliminary injunction as to the misappropriation of trade secrets claims against Sparta and Playground and the tortious interference claim against Playground. Bertec has maintained its

request for a preliminary injunction preventing Sparta from breaching the contract "so that the parties can proceed with the lawsuit under the status quo, i.e. the terms of the Agreement." *Id.* at 1.

### A. Likelihood of Success on the Merits

The first factor the Court must address is Bertec's likelihood of success on the merits of its claims. In order to show a likelihood of success on the merits, "a plaintiff must show more than a mere possibility of success." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citing *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.,* 119 F.3d 393, 402 (6th Cir.1997)). The Sixth Circuit has held that where the other factors favor injunctive relief, "a lower court is within its discretion in issuing a preliminary injunction if the merits present sufficiently serious questions to justify further investigation." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir. 1985); *see Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) ("The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.").

#### 1. Breach of Contract Claim

Bertec's motion for a preliminary injunction argued that Bertec breached the Agreement between them by notifying Bertec that it would be creating its own force plates and by using Bertec's source code to develop its own force plates. (ECF No. 2 at 12-15). In its reply, Bertec narrowed its breach of contract claim, arguing that Sparta has breached the Agreement by: (1) purchasing force plates that it needs from another company; and (2) not co-branding and co-marketing the force plates it purchased from Bertec. (ECF No. 56 at 1). Bertec adds that Sparta has admitted to buying the force plate it designed jointly with Playground from another supplier,

5

BriteLab. (ECF No. 56 at 3). Sparta argues that it has not breached the Agreement because the Agreement only required it to purchase 80 force plates of the specific model number listed in Exhibit A to the Agreement and that making its own force plates does not constitute a breach of the agreement. (ECF No. 47 at 9-11).

To establish a breach of contract, a party is required to show: "1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff." *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F.Supp.2d 763, 769 (N.D.Ohio 2004) (citing *Samadder v. DMF of Ohio, Inc.,* 154 Ohio App.3d 770, 778, 798 N.E.2d 1141 (2003)).

Sparta does not contest that there is a valid contract between the parties or that Bertec has performed according to the terms of the contract, but does take issue with Bertec's "interpretation of its terms and . . . whether Sparta is in breach." (ECF No. 47 at 9). Sparta argues that the Agreement is silent on whether Sparta may manufacture its own force plates but concedes that its purchase of force places of any kind from any other entity would violate the terms of the Agreement and that as a result it has not purchased force plates from any other manufacturer. (ECF No. 47 at 11). Sparta argues that the contract only requires Sparta to purchase the goods in the exact quantity listed in Exhibit A of the Agreement and that Sparta specifically negotiated Section 2.1 of the Agreement to ensure that Sparta retained the freedom to manufacture its own plates. *Id.* at 10-11. It adds that it has purchased those goods in the quantities specified since it signed the Agreement, that it no longer needs the force plates that Bertec makes, and that Bertec has never sought to modify Exhibit A to the Agreement. *Id.* at 9-10. As a result, Sparta claims that it has not breached the provisions of the Agreement by making its own force plates.

Bertec argues that the title and Section 2.1 of the Agreement evidence the intent of the parties that the Agreement is a requirements contract whereby Sparta would purchase all of the force plates it needs from Bertec. (ECF No. 56 at 2-3). Bertec explains that Exhibit A does not set 80 units as the total quantity that Sparta has agreed to purchase but instead just contains "two volume pricing terms based on the size of Sparta's two most recent blanket orders for Sparta's preferred Bertec plate." (ECF No. 56 at 3). Bertec adds that the statements of Sparta's CEO both before and after the contract support this interpretation of the contract. *Id*. at 2.

In Ohio, contract interpretation is a question of law to be determined by the court. *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012). When construing contracts, Ohio courts "attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgt. Co.*, 124 Ohio App. 3d 84, 88, 705 N.E.2d 691, 693 (1997). Ohio law defines a requirements contract as a: "contract in writing whereby one agrees to buy, for sufficient consideration, all the merchandise of a designated type which the buyer may require for use in his own established business." *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 3rd Dist. No. 6-15-02, 2015-Ohio-3714, 41 N.E.3d 915, ¶ 40 (citing *Fuchs v. United Motor Stage Co.*, 135 Ohio St. 509 (1939)). Exclusivity is a key feature of a requirements contract, and Ohio courts also recognize as requirements contracts agreements "where one party promises to buy exclusively, and the other party agrees to deliver specific goods or services which the buyer may need for a certain period of time." *Jackson Tube Serv., Inc. v. Camaco LLC*, 2nd Dist. Miami No. 2012 CA 19, 2013-Ohio-2344, ¶ 13. A valid requirements contract "may designate a product by brand name and still preclude the buyer from purchasing similar products of a different brand." *Fike Corp. v. Great Lakes Chem. Corp.*, 332 F.3d 520, 524 (8th Cir.2003) (citing *Pepsi–Cola Co. v. Steak 'N Shake, Inc.,* 981 F.Supp. 1149, 1158–59 (S.D.Ind.1997)).

7

The Agreement between the parties starts with a title indicating, in relevant part, "WHEREAS, Buyer wishes to purchase certain the Goods exclusively from Seller." (ECF No. 47-1 at 2). Section 2.1 of the Agreement states:

> Subject to the terms and conditions of this Agreement, during the Term, **Buyer shall purchase exclusively from Seller, and Seller shall manufacture and sell to Buyer, Buyer's requirements of the Goods**. Exhibit A contains: (a) a description of the Goods to be manufactured and sold hereunder; (b) the purchase price for the Goods; and (c) the quantity of the Goods. Unless otherwise provided in Exhibit A, subject to the terms and conditions of this Agreement, **Buyer shall purchase from Seller, and Seller shall manufacture and sell to Buyer, 100% of Buyer's requirements of the Goods.** The Parties shall, from time to time, amend Exhibit A to reflect any agreed revisions to any of the terms described in the foregoing clauses (a)-(c); provided that no such revisions will modify this Agreement or be binding on the Parties unless such revisions have been fully approved in a signed writing by authorized Representatives of both Parties.

(ECF No. 47-1 at 25). Goods are defined in the agreement as:

> "**Goods**" means **force plates** provided by Seller, **including but not limited to** those identified on Exhibit A. In the event that Buyer requests force plates that are not currently identified on Exhibit A, the Parties agree that Exhibit A shall be amended to include said force plates.

*Id*. at 21-22.

The Agreement appears to be a classic requirements contract, and even uses those terms in describing Bertec's obligation to sell to Sparta "Buyer's requirements of the Goods." (ECF No. 47-1 at 25). Section 2.1 is clear that Sparta is required to purchase *any* force plates that it needs from Bertec. The definition of "Goods" is worded broadly to mean "force plates provided by Seller." If that were not enough, the definition of "Goods" states specifically that is "including but not limited" to the products listed on Exhibit A.

At the hearing and in its briefing, Sparta focused on the differences between Bertec's force plate and the Playground designed plate, arguing that it no longer needs Bertec's force plate because it gathers information along three dimensions while as Sparta's is much simpler and gathers information in only one dimension. (ECF No. 47 at 10). Because the two plates are

8

different, Sparta argues, the requirements contract does not apply to its purchase of the Playground plate. This situation appears to be a case of buyer's remorse. Sparta has not proven that the Playground plate is materially different, only that it provides fewer features and is cheaper than the Bertec plate. The Playground designed plate is still a force plate and the terms of the contract apply to "force plates." Bertec has presented evidence that the specific plate listed in Exhibit A was custom made for Sparta. (ECF No. 36-2). Sparta has not provided any evidence that Bertec was unable or unwilling to custom make a cheaper force plate that would better suit Sparta's need to reduce costs. Additionally, Sparta does not dispute that it is now purchasing force plates that Playground designed from BriteLabs. (ECF No. 47 at 5 n. 3). Therefore, Bertec has demonstrated a strong likelihood of success in its breach of contract claim regarding Section 2.1 of the Agreement.

Bertec also argues that Sparta has breached the Agreement by failing to conform with the co-branding and co-marketing provisions of the Agreement, Section 7.3. (ECF No. 2 at 10; ECF No. 56 at 6). Section 7.3 of the Agreement provides as follows:

> 7.3 <u>Marketing</u>. Licensee agrees that all force plates provided by Licensor to Licensee shall be co-branded to include both Licensor's and Licensee's brands. Additionally, Licensee's website(s) shall identify Licensor when referencing force plates in a manner and frequency satisfactory to Licensor. Licensee's website(s) shall also include Licensor's logo where force plate technology is addressed, in a manner satisfactory to Licensor. Licensor will feature Licensee as one of Licensor's original equipment manufacturer (OEM) partners on Licensor's new website. The Parties shall, within a reasonable time after the Effective Date and after Licensee is featured on Licensor's new website, each cause a press release to be published notifying the market of said co-branding relationship between the Parties.

(ECF No. 47-1 at 31). During the hearing, Sparta argued that it fulfilled this obligation because it did not prevent Bertec from putting its logo on the force plates and that it had issued a press release indicating that Sparta used Bertec's force plates. Bertec supports its claim by citing to emails and deposition testimony of Sparta's CEO, Dr. Phil Wagner, indicating that Sparta requested the

9

inclusion of Section 7.3 in the contract, and consequently understood that it was an obligation, and that it failed to co-market and co-brand intentionally as it was preparing to release its own force plate. (See ECF No 56 at 6, Exhibits P-23, P-36, P-39, P-83). Importantly, one of the documents relied on by Bertec is an email between Sparta's CEO, Phil Wagner, and Sparta's Chief Brand and Marketing Officer, Denise Terry. In this email, Terry points out to Wagner that "we do not highlight the Bertec hardware or mention the force plate much anywhere." (ECF No. 56-12 at 1). Wagner replies that he did not think they should mention Bertec since "we are developing our own." *Id.* This email indicates that Sparta made the conscious decision to not co-market Bertec because it intended to create its own competing product. Thus, Bertec has demonstrated a strong likelihood of success on its breach of contract claim as to Section 7.3 of the Agreement.

With respect to its overall breach of contract claims, therefore, Bertec has demonstrated a strong likelihood of success.

In its motion for a preliminary injunction, Bertec also argued that Sparta promised Bertec that Sparta would source its force plates exclusively from Bertec and should consequently be held liable since Bertec relied on this representation in entering the Agreement. (ECF No. 2 at 14). The doctrine of promissory estoppel cannot be invoked where an enforceable contract governs the same subject matter. *See Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F.Supp.2d 899, 919 (S.D. Ohio 2009); *see also Borowski v. State Chem. Mfg. Co.*, 97 Ohio App.3d 635, 643, 647 N.E.2d 230 (1994) (noting "[p]romissory estoppel does not apply to oral statements made prior to the written contract, where the contract covers the same subject matter."). Having determined that the Agreement addresses directly Sparta's alleged promises to Bertec, this Court declines to determine Bertec's promissory estoppel claim.

## B. Irreparable Injury

Bertec must also demonstrate that it would face irreparable harm absent injunctive relief. Generally, harm is not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). In its preliminary injunction motion, Bertec originally argued that it would suffer irreparable harm from Sparta's disclosure of its source code. (ECF No. 2 at 17-18). Bertec has seemingly abandoned this argument in its reply, arguing instead for the first time that it faces three types of irreparable harm relating to its above discussed breach of contract claims: (1) loss of market share; (2) loss of goodwill; and (3) price erosion. (ECF No. 56 at 7).

### 1. Loss of Market Share

Sparta argues that Bertec's injury is compensable by money and that Bertec's CEO has conceded this in his deposition by stating that the remedy he seeks is payment for the force plates he expected Sparta to purchase. (ECF No. 47 at 18). During the hearing and in its briefing, Sparta argued that Bertec's breach of contract claim is fully compensable by money damages because it is possible to calculate at the end of five years the number of force plates that Sparta has manufactured and then reimburse Bertec in that amount. (ECF No. 47 at 18). Bertec counters that Sparta's purchase of plates from BriteLab will cause Bertec to lose market share in the athletics and healthcare markets since Sparta will now be its competitor in those markets.

To support its proposition that loss of market share is an irreparable injury, Bertec relies on this court's prior decision in *Norm Gordon & Assocs., Inc. v. Geo-Tech Polymers, LLC*, No. 2:18-CV-667, 2018 WL 4300848, at *2 (S.D. Ohio July 11, 2018). In *Norm Gordon*, however, this Court merely stated that the plaintiff "stands to lose goodwill and market share if it is unable to deliver on its contractual obligations" and found that the irreparable harm stems from the plaintiff's

loss of goodwill in the marketplace. *Id*. Importantly, in *Norm Gordon* and not at issue here, the damage to Norm Gordon's reputation was irreparable since Geo-Tech's breach of contract as to the destruction of sensitive information implicated Norm Gordon's "business model" which was "geared toward destruction of sensitive and legally-protected documents." *Id.*

The Sixth Circuit has determined that loss of market share alone is often insufficient to establish irreparable injury where the injury is compensable by money damages, and there is no showing that "the market was so limited that the damage would be irreparable." *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir.1991) (determining that district court did not abuse its discretion in denying injunction on grounds that injuries were compensable by money damages). Where a loss of sales and a loss of market share would harm a party's "goodwill and competitive position in ways that would be hard to compensate," however, a preliminary injunction is appropriate. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015).

Here, Bertec claims it will suffer irreparable harm because the market for force plates is small since most customers will only purchase force plates once every 7-10 years and will often continue purchasing the same brand for "service and maintenance standardization." (ECF No. 56 at 8). A plaintiff is required to adduce evidence of "consumer confusion, loss of market share, [or] damage to reputation" that shows that the threatened harm is "actual and imminent, not speculative or unsubstantiated." *FirstPower Grp. LLC v. WD-40 Co.*, No. 5:17-CV-392, 2017 WL 3034499, at *12 (N.D. Ohio July 18, 2017) (internal quotation marks omitted) (determining that plaintiff failed to establish irreparable harm where plaintiff offered no substantive evidence of market share other than testimony by plaintiff's principal that it feared that it would lose market share). Evidence of loss of market share as a form of irreparable harm is often proven through the testimony of

expert witnesses. *See e.g., Malibu Boats, LLC v. Nautique Boat Co.*, 997 F. Supp. 2d 866, 886 (E.D. Tenn. 2014) (discussing plaintiff and defendant's use of expert witnesses to demonstrate element of irreparable harm through plaintiff's loss of market share). While Bertec did bring an expert to testify as to market share, it failed to provide timely notice to Sparta of its proposed expert. As a result, this Court determined it would unfairly prejudice Sparta for the expert to testify given that Bertec had known about the expert for two weeks but failed to give Sparta any notice that the expert would testify until the Friday before the hearing. Consequently, the only evidence that Bertec presented as to loss of market share was the testimony of Bertec's CEO, Murat Berme.

Testimony from a witness for the plaintiff that is conjectural and only based on the plaintiff's "fears" of what might happen is insufficient to establish irreparable harm. *FirstPower Grp. LLC,* 2017 WL 3034499 at *13. Here, Bertec has not sustained its burden of proving irreparable harm as to loss of market share, as it has not adduced sufficient evidence indicating that the market for force plates is so limited that it would be difficult to estimate damages. During the hearing, Bertec's CEO merely testified as to his "fears" regarding loss of market share and provided no data, expert testimony, or market analysis that would support his fears. *Id.*

Additionally, during the hearing and in its brief, Bertec clarified that it was only in the athletics market through Sparta and any and "every sale it makes with a non-Bertec plate is one Bertec is not selling because of finite customer resources." (ECF No. 56 at 8). Even if Bertec's loss of market share is presumed, this statement evidences that the harm to Bertec is fully compensable through money damages since it is possible to calculate Bertec's injury by adding up each sale that Sparta makes of its new, cheaper force plate.

### 2. Loss of Goodwill

Bertec argues that as a result of Bertec's failure to co-brand and co-market, it will continue to lose customer goodwill that should have accrued to Bertec. According to Bertec, the purpose of the Agreement was to provide Bertec with a means of entering the healthcare market in which Sparta competes. (ECF No. 56 at 7-9). Bertec adds that Sparta's production of an "inferior" plate also injures Bertec's ability to develop customer goodwill because Bertec and Sparta were intended to be partnering together and since they are not, Bertec's product will not be marketed or available to end-consumers. (ECF No. 56 at 9).

As indicated above, loss of good will is a form of irreparable injury that a preliminary injunction is designed to protect against. *See Norm Gordon & Assocs., Inc. v. Geo-Tech Polymers, LLC*, No. 2:18-CV-667, 2018 WL 4300848, at *2 (S.D. Ohio July 11, 2018); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279-80 (6th Cir. 2015) ("to the extent there is a realistic prospect of lost sales and market share, these losses would harm Collins' goodwill and competitive position in ways that would be hard to compensate.").

While loss of goodwill is considered an irreparable injury, it is unclear how Sparta's failure to advertise Bertec will result in loss of goodwill or tarnish Bertec's reputation in the market, apart from decreased visibility. In *Norm Gordon*, the defendant's failure to destroy items that Norm Gordon contracted with it to destroy tarnished Norm Gordon's reputation since its "business model is geared toward destruction of sensitive and legally-protected documents" and the possibility that sensitive information would be leaked would threaten plaintiff's reputation in the market. *Norm Gordon & Assocs., Inc. v. Geo-Tech Polymers, LLC*, No. 2:18-CV-667, 2018 WL 4300848, at *2 (S.D. Ohio July 11, 2018). Because the harm here, lack of visibility, is compensable through

money damages that Bertec could then use to advertise its own product without Sparta's help, the loss of goodwill is not an irreparable harm.

### 3. Price Erosion

Finally, Bertec argues that it would suffer the irreparable harm of price erosion since Sparta is marketing its plate for much less than Bertec sells its plates for in the markets in which Bertec competes. (ECF No. 56 at 10). Lower courts in the Sixth Circuit are split as to whether price erosion is considered an irreparable injury. Some courts do not consider price erosion to be an irreparable injury unless it is irreversible and due to a complex pricing scheme outside the control of the parties. *See Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 692 F. Supp. 2d 805, 821 (N.D. Ohio 2010). Others believe that it can be a form of an irreparable injury just like loss of good will. *See Anderson v. TOL, Inc.*, 927 F. Supp. 2d 475, 487 (M.D. Tenn. 2013) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.") (citing *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1362 (Fed.Cir.2008)).

Here, Bertec concedes that price erosion is normally a quantifiable damage, but due to the uncertainty as to the duration, magnitude, and extent of the possible price erosion, it is not compensable by damages in this instance. Bertec provides no evidence that Sparta actually intends to sell this plate to compete with Bertec, that price erosion has occurred or is inevitable, or that the damages resulting from price erosion are difficult to calculate. Even assuming that price erosion will actually occur, the damages owed to Bertec are easily calculated by reference to the amount that Sparta is charging for the plate and Bertec's prices prior to the sale of the competing force plate. *See Malibu Boats, LLC v. Nautique Boat Co.*, 997 F. Supp. 2d 866, 888 (E.D. Tenn. 2014) (denying motion for preliminary injunction determining that plaintiff failed to show irreparable harm in form of price suppression because plaintiff did not show "that the consequences of any

15

such price suppression could not be calculated in determining plaintiff's damages after a trial on the merits.").

Accordingly, Bertec has failed to meet its burden of demonstrating that it will face irreparable harm that is not compensable by money damages.

Irreparable harm is an "indispensable" and "mandatory" factor. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). The Sixth Circuit has determined that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *Id.* at 326–27 (internal quotation marks omitted). Therefore, this Court declines to address the remaining factors because Plaintiff has failed to show irreparable injury, and this Court concludes that a preliminary injunction cannot issue.

## IV. CONCLUSION

For the reasons stated herein, this Court **DENIES** Bertec's Motion for a Preliminary Injunction as to its breach of contract claims. Bertec's motion for an injunction as to its tortious interference and misappropriation of trade secrets claims is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**Dated: December 27, 2019**